UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| 453 LAUREL RD HOLDINGS, LLC, | ) | |
| | ) | Case No. 6:25-cv-00094-REW-HAI |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | & |
| STATE FARM FIRE AND CASUALTY COMPANY, | ) | ORDER |
| | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

This is a contract dispute regarding insurance. The matter is before the Court on Defendant State Farm Fire and Casualty Company's Motion to Set Aside an appraisal award, which issued per the relevant policy's mechanics. DE 17. Plaintiff 453 Laurel Road Holdings, LLC, filed a Response[1], *see* DE 18, DE 19], and State Farm a Reply, *see* DE. 20. The motion is fully briefed and ready for adjudication. For the reasons that follow, the Court **GRANTS** State Farm's motion.

## I. Background

### A. Facts

The facts of this matter are extensive but not complicated. Plaintiff owns a six-building apartment complex located at 453 S Laurel Road in London, Kentucky. DE. 1-1 at 1; DE. 17-1 at 2. Plaintiff maintained a property insurance policy with State Farm. *Id.* On April 25, 2024, Plaintiff suffered damage to the property under a "covered loss" event covered by the policy. *Id.* at 2. Plaintiff alleges that State Farm wrongfully underpaid the claim and misrepresented facts about the loss and the policy's terms. *Id.*

[1] Plaintiff submitted an initial Response, *see* DE 18, and then subsequently re-filed the Response with Corrected Exhibits, *see* DE 19. The Response briefing contained in both docket entries is itself identical.

Jackie Meade, a public adjuster, contacted State Farm on Plaintiff's behalf to report a theft loss that occurred at the apartment complex on or around April 25, 2024. DE 17-1 at 2. Meade specifically reported to State Farm the theft of copper wiring and piping. *Id.* Meade obtained a police report from the London Police Department dated May 1, 2024, claiming a loss from theft of "electrical wiring and copper piping." *Id.* at 2; DE 17-4 (Police Report). State Farm Specialist Kevin Root then inspected the property with Meade. DE 17-1 at 2. That inspection confirmed that one of the six buildings incurred damage from the theft of the copper wiring and piping in addition to damage to electrical systems. *Id.* Later, on June 26, 2024, Meade submitted a series of nine photographs to State Farm depicting the extent of the loss as limited to a single building. *Id.*; *see also* DE 17-6 (photograph).

After the inspection, Meade provided a signed Proof of Loss document and estimate. DE 17-1 at 3. Here is where the breakdown between the parties began, as relevant to this decision. Meade's estimate totaled $448,936.50 for line-items that State Farm characterizes as "unrelated to the theft of copper," including "expenses associated with replacing drywall, insulation, doors, casing, windows, vinyl flooring, a bathtub[,] and light fixtures" in multiple buildings. *Id.*; DE 17-7. State Farm alleges that this estimate greatly exceeded the scope of and was untethered to the original claim: damage and theft from a single building. State Farm requested that Meade provide a Sworn Proof of Loss using a State Farm form and requested a second inspection.

According to State Farm, at the second meeting, Meade again directed the State Farm representatives to the same previously inspected building. State Farm avers that Meade "never mentioned any damage beyond the stolen copper wire and piping in the one building." DE 17-1 at 4. Meade then submitted the second proof of loss on the State Farm form on September 24, 2024. *Id.* This sworn and signed proof of loss claimed only $116,953.17 in damages. DE 17-9.

State Farm then completed its own estimate pricing the cost of material and labor at $114,634.91. DE 17-10. State Farm's proof, from investigator Root, is that Meade confirmed at every inspection that only Building 5 and only damage from copper wiring/piping theft were at issue. *See* DE 17-5 ¶ 7.

On April 22, 2025, Plaintiff's counsel sent State Farm a letter of representation and requested a copy of State Farm's estimate. DE 17-1 at 4. Plaintiff subsequently filed the instant lawsuit, arguing that State Farm breached the terms of the insurance policy and acted in bad faith when doing so. In correspondence between the parties, Plaintiff's counsel noted that Meade's proof of loss claim did not address the entire claim, and that a second claim existed for the loss of building materials at the complex. *Id.* State Farm claims this is the first time it heard about this second claim, as their focus remained on the damage from the copper theft. *Id.* Plaintiff then demanded an appraisal according to the terms of the insurance contract. *Id.* The appraisal policy reads:

> If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. Each party will notify the other of the selected appraiser's identity within 20 days after receipt of the written demand for an appraisal. The two appraisers will select an umpire. If the appraisers cannot agree upon an umpire within fifteen days, either may request the selection be made a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will: (1) pay its chosen appraiser; and (2) bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

DE 17-12 at 57.

State Farm agreed, conditionally, to the appraisal process, and stated via email that

> State Farm will agree to an appraisal concerning the theft claim for copper wire and copper plumbing. State Farm, however, will require additional time to investigate the claims asserted for property damage which were not previously disclosed during State Farm's inspection of the property or by the insured's Public Adjuster, Jackie Meade.

DE 17-1 at 5; DE 17-13 at 1. According to State Farm, "no objection was provided in response to State Farm's limitation as to the scope of the appraisal." DE 17-1 at 5. State Farm and Plaintiff identified their respective appraisers as Karen Taylor and Jason Juday. *Id.* at 6. Taylor's appraisal evaluated the copper wiring and piping theft claim at a single building and produced an estimate in the amount of $200,571.93. DE 17-14. Juday's appraisal, however, estimated far more, totaling the amount of $518,896.18 and addressing losses evidently as to a variety of matters across all six apartment buildings. DE 17-15. The variance between Taylor and Juday's appraisal triggered the umpire provision of the contract's appraisal clause. *See* DE 17-12 at 57.

Anthony Proffitt served as the umpire. DE 17-1 at 6. Proffitt entered an Appraisal Award in the amount of $498,676.16, accepting Juday's categories and damages. DE 17-16. By this motion, State Farm takes issue with the Appraisal Award. State Farm argues that both Juday and Proffitt's appraisals exceeded the agreed-to appraisal for copper wiring and piping theft and damage at a single building, and instead accounted for Plaintiff's other, uninvestigated claims of loss. DE 17-1 at 6. Indeed, State Farm points out that the Appraisal Award entered by Proffitt fails to even reference any items related to the electrical copper and piping theft, instead focusing on windows and carpentry across the property's six buildings. *Id.*

In its response, Plaintiff argues that State Farm distorts the facts leading up to the appraisal process. DE 18 at 1. Plaintiff challenges that there was ever an agreed-upon limitation as to the scope of the appraisal and contends that Plaintiff, from the beginning, sought to include damages that went beyond the copper wiring and piping. *Id.* Plaintiff's first proof of loss, via Meade's

document, reflected its claimed full estimated damages in the amount of $448,936.50. *Id.* at 2–3. Plaintiff then submitted the second proof of loss form which estimated $116,953.17 for "contents" losses and for damages to buildings, while Plaintiff waited on an engineering report. *Id.* at 3.

Plaintiff claims that Meade and Metro Public Adjustment made nine written requests to State Farm seeking the post-inspection estimate, an engineer's report, and other information. *Id.* Plaintiff alleges that State Farm did not substantively respond to these requests for nearly five months. *Id.* at 4. State Farm then responded on November 7, 2024, with their loss estimate of $114,634.91. *Id.* at 4. In November 14, 2024, correspondence, State Farm provided a list of reasons why it refused coverage for other claims such as "windows and rear doors [that] had been damaged for years" and stated that "the flooring receipts submitted will not be considered as the drywall has not been completed in that entire building and no one would place new flooring, that could be damaged during the repair process, in a building under repair." *Id.*; DE 19-1. In Plaintiff's view, this indicates both that Plaintiff claimed damages beyond the copper wire and tubing and that State Farm knew about this and investigated it before denying the claim for the reasons stated in the November 14th letter. DE 19 at 4.

Plaintiff also disputes that it agreed in any way to an appraisal limited to the copper wire and tubing damage. *Id.* at 6. In a January 2, 2026, email, *see* DE 19-3, Plaintiff's counsel told State Farm's counsel, "for the record," that "we dispute that this claim 'was not previously disclosed'" and that "my client made a claim under its all-risk policy[.]" *Id.* Plaintiff offers that this confirms that it did not agree to any limitation on the scope of the claim or the appraisal. *Id.*

**B. Procedural History**

On April 24, 2025, Plaintiff filed a complaint in the Laurel Circuit Court, bringing a four-count complaint for breach of contract, statutory bad faith, common law bad faith, and for violating

Ky. Rev. Stat. § 304.12-235. *Id.* at 2–4. State Farm removed the action to federal court on May 23, 2025, on the basis of diversity jurisdiction. DE 1 at 1–2.

The Court ordered the parties to meet and confer pursuant to Fed. R. Civ. P. 26 on July 2, 2025, *see* DE 7, and the parties submitted their first Rule 26(f) report on August 20, 2025, *see* DE 13. State Farm moved to bifurcate the breach of contract and bad faith claims on July 30, 2025. DE 8. On September 4, 2025, Magistrate Judge Hanly A. Ingram granted State Farm's Motion to Bifurcate. DE 15. The Court then ordered a new Rule 26(f) report on April 22, 2026, citing the lapse in time between the parties' original report and the disposition of the bifurcation motion. DE 16. On June 5, 2026, State Farm filed the instant motion to set aside the appraisal award. DE 17.

On July 10, 2026, Judge Gregory F. Van Tatenhove reassigned this case to the undersigned. DE 21. Magistrate Judge Hanly A. Ingram later issued a Show Cause order to the parties, requiring them to explain why they had not submitted the second Rule 26(f) report as required by the Court's April 22, 2026 Order. DE 24. In their response, State Farm informed the Court that the parties had not filed a new Rule 26(f) because they awaited the Court's resolution of State Farm's motion to set aside the appraisal award. DE 25. As State Farm framed it, discovery would be unnecessary if the Court upheld the appraisal award because the appraisal award constituted "a final determination regarding the value of the claim." *Id.* As such, "neither party believes that discovery, disclosure of experts, mediation or other matters . . . are warranted based upon the appraisal," and that "depending on the Court's ruling,. . the parties may need to address additional items . . . which can only be determined once the pending motion is decided." *Id.* (citation modified). The Court hereby GRANTS DE 17.

## II. Standard of Review

The interpretation of an insurance contract is a matter of law. *Foreman v. Auto Club Prop.-Cas. Ins. Co.*, 617 S.W.3d 345, 349 (Ky. 2021). A court interpreting an insurance contract is "bound by the specific language of the contract before [it]." *Id.* Kentucky courts apply three rules of construction when interpreting insurance contracts. *See Bachelor Land Holdings, LLC v. Chubb Custom Ins. Co.*, No. 3:11-CV-152, 2011 WL 5389197, at *4 (W.D. Ky. Nov. 4, 2011) (collecting cases). First, "when the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced as written." *Foreman*, 617 S.W.3d at 349 (citing *Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 685 (Ky. 2012)). Second, any ambiguous terms "are strictly construed against the insurer," but "this rule of strict construction certainly does not mean that every doubt must be resolved against the insurer and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the plain meaning of the contract." *Id.* at 350–51 (citing *Stone v. Ky. Farm Bureau Mut. Ins. Co.*, 34 S.W.3d 809, 811 (Ky. App. 2000); *Tower Ins. Co. of N.Y. v. Horn*, 472 S.W.3d 172, 174 (Ky. 2015)). Third, the Court cannot apply the "'ordinary meaning'" of ambiguous terms, and a policy is ambiguous "'only when the provision to be construed is reasonably susceptible of more than one meaning.'" *Bachelor Land Holdings*, 2011 WL 5389197, at *4 (quoting *Foster v. Ky. Hous. Corp.*, 850 F. Supp. 558, 561 (E.D. Ky. 1994)).

## III. Analysis

The sole issue before the Court is whether the umpire's appraisal award is binding. Relief generally obtains, as to the result of agreed appraisal mechanics, only if the appraisal is the result of fraud, bad faith, a material mistake, or a lack of understanding or completion of the contractually assigned task. *See Kenneth D. Parrish, DMD, Ph.D., P.S.C. v. Schroering,* 636 S.W.3d 133, 144 (Ky. Ct. App. 2021), *rev. denied* (Jan. 11, 2022). No party has argued that the appraisers or the

umpire acted fraudulently. Similarly, State Farm does not suggest that the appraisers or the umpire acted in bad faith. Instead, the parties dispute whether the "scope" of the appraisal was limited to the theft of copper wiring and piping, as State Farm contends, and whether the appraisal's scope exceeded the single claim for theft that occurred on April 25, 2024. For the reasons that follow, the Court finds that the appraisal award must be set aside due to the misunderstanding of the assigned task among the appraisal participants, including the appraisers and the umpire.

"Generally, a court will not interfere with an appraisal award but, to the contrary, will indulge in every reasonable presumption to sustain it in the absence of fraud, mistake, or malfeasance." *Lakewood Mfg. Co. v. Home Ins. Co. of N.Y.*, 422 F.2d 796, 798 (6th Cir. 1970). "A court will not substitute its judgment for that of the appraisers or set aside an award for inadequacy or excessiveness unless it is so palpably wrong as to indicate corruption or bias on the part of the appraisers." *Id.* (citing 44 Am. Jur. 2d Insurance § 1719 (1969)); *see also* 44 Am. Jur. 2d Insurance § 1619 (2026). Courts presume that appraisals are valid but may set aside an appraisal award "upon a showing of fraud, bad faith, a material mistake, or a lack of understanding or completion of the contractually assigned task." *Parrish*, 636 S.W.3d at 144 (emphasis removed). Courts "indulge in every reasonable presumption" to sustain an appraisal award absent these factors. *Id.*

The Court must determine whether the appraisal award resulted from a "material mistake" or from a "lack of understanding or completion of the contractually assigned task." *Id.* "A mistake, in order that it may affect a contract, must be a mistake of fact." *Murphy v. Torstrick*, 309 S.W.2d 767, 770 (Ky. 1958). "A mistake of law may be defined as an erroneous conclusion respecting the legal effect of known facts." *Sadler v. Carpenter*, 251 S.W.2d 840, 842 (Ky. 1952). A mistake of fact, on the other hand, is "a mistake about a fact that is material to the transaction[.]" *Mistake*,

BLACK'S LAW DICTIONARY (12th ed. 2024). A material mistake of fact is one that "goes to the root of the matter or the whole substance of the agreement." *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 704 (Ky. 2006).

What constitutes a "lack of understanding" of the contractually assigned task is somewhat less clear.[2] Since *Parrish*, no court in the Commonwealth has interpreted this term as it applies to rescinding an appraisal award.[3] In *Parrish*, the Kentucky Court of Appeals lifted the rule statement for setting aside appraisals from *Calais Co., Inc. v. Ivy*, 303 P.3d 410 (Alaska 2013). *Parrish*, 636 S.W.3d at 144. In *Calais*, the Alaska Supreme Court looked to other state or locality court decisions, including from Wisconsin and the District of Columbia, to adopt the rule that "appraisal clauses are generally reviewable for fraud, bad faith, material mistake, or a failure to understand or complete the contractually assigned task." 303 P.3d at 416 (citing *Farmer's Auto. Ins. Ass'n v. Union Pac. Ry. Co.*, 768 N.W.2d 569, 607 (Wis. 2009); *Wash. Auto. Co. v. 1828 L St. Assocs.*, 906 A.2d 869, 875 n.3 (D.C. 2006)).

The facts of *Calais* somewhat resemble the facts of this case. Ivy, the defendant, was a shareholder of plaintiff Calais Co., a real estate development group owning large tracts of land in the Anchorage area. *Id.* at 411. Ivy owned about 6.25 percent of Calais's stock and sought to involuntary dissolve the company. *Id.* The parties reached a settlement agreement where Calais agreed to purchase Ivy's shares at a "fair value as determined by a three-member panel of

---

[2] There is, obviously, no allegation that the contractually-assigned task—the appraisal process leading to this appraisal award—was not "completed." However, the precise task involved surely is disputed.

[3] The Court in *Parrish* also did not interpret this phrase. The Court reversed the trial court's finding that conflicting valuation techniques used by the appraisers violated that particular contract at issue. 636 S.W.3d at 145–46. In essence, the *Parrish* court reviewed the right of the appraisers to valuate a dental practice on an asset-based rather than income-based approach, a factual distinction quite different from the facts of the insurance dispute *sub judice*. *Id.* at 143. The Court did assess whether the assessment method squared with the contract parameters.

appraisers." *Id.* (internal quotations removed). The appraisal procedure resembled the procedures employed here:

> Calais and Ivy were to each nominate one appraiser, and these two appraisers were to select a third. The appraisers were "to determine the fair value of Calais in accordance with the Settlement Agreement and [Alaska's involuntary dissolution statute], as of the date of the Settlement" using "their expertise and judgment" and "giving due consideration to all Calais liabilities and to the fair market value of Calais assets."

*Id.* at 412 (citation modified). The basic appraisal procedure in *Calais* and here are similar. Both parties select their own appraiser, who in turn select a third appraising party. In *Calais*, this third appraiser was ostensibly a co-appraiser, rather than an umpire, but this third appraiser had the same effect as an umpire in the sense that "[a]n agreement on the value of Calais need only be reached by two of the three appraisers, and that valuation shall be binding on the parties[.]" *Id.*

Ultimately, two of the appraisers assessed the fair market value of Calais at $92.5 million and one appraiser valued Calais at $43 million. *Id.* at 411. Calais initially asked the courts to find that the appraisers "had not followed the procedures set forth in the Agreement" because the appraisers did not consider the Agreement's requirement that they consider various liabilities as defined in Alaska's involuntary dissolution statute. *Id.* at 413, 417. Calais argued—and the Court agreed—that the Agreement's plain language demonstrated that the parties intended "fair value" to mean "liquidation value" as defined by state statute. *Id.* at 418. The Alaska Supreme Court ruled that the appraisers lacked an understanding of their assigned task when they conducted the appraisal without considering the statute's definition of the term "fair value."

The Wisconsin Supreme Court's decision in *Farmers Auto* provides further instruction in analyzing whether a group of appraisers misunderstood their task. Joseph Donabauer brought a lawsuit against Farmers, his insurer, for breach of contract, misrepresentation, and bad faith.

*Farmers Auto*, 768 N.W.2d at 600. Part of that suit involved a dispute where the Wisconsin Supreme Court had to decide whether to vacate or modify an appraisal award. *Id.* at 599. That appraisal process resembled the procedures followed by State Farm in the case *sub judice*: Both parties selected an appraiser, who chose an umpire. *Id.* at 600. In *Farmers Auto*, however, all three appraisers agreed on the replacement value of Donabauer's home. *Id.* at 602.

Donabauer thought the appraisal was too low and argued that the appraisers "displayed significant confusion" by opining on the "attractiveness or unattractiveness of certain features of his original home." *Id.* at 603. The court first noted that "unhappiness with the amount of an appraisal award is not enough to set it aside" before framing their analysis as "limited to the face of the award." *Id.* at 607. The court found that nothing on the face of the award demonstrated that the appraisers misunderstood their task. *Id.* at 608. The award thoroughly "itemized the components of the valuation and gave the replacement cost and actual cash value for each" and otherwise gave specific values for individual features of the property including its kitchen, septic system, outbuildings, and landscaping. *Id.* Nothing on the face of the award supported Donabauer's theory that the appraisers "misunderstood" their task, and the meticulous detail with which the appraisers drafted the award supported the opposite conclusion. *Id.* at 608–09. The *Farmers Auto* decision, relied upon by the *Calais* decision cited in *Parrish*, stands for the proposition that the Court may look to the face of the award to determine whether the appraisers understood their charged task.

Material mistakes of fact and task misunderstandings sometimes blend together. Such a situation arguably occurred in *Elswick v. Justice*, 154 S.W.2d 714 (Ky. 1941). The Kentucky Court of Appeals set aside the appraisal of certain foreclosed property due to the appraisers' mistaken

belief that the property contained 80 acres when it actually encompassed 176 acres.[4] *Id.* at 714. This constituted a mistake of fact warranting setting aside the appraisal award. *Id.* The *Parrish* court highlighted *Elswick* as exhibiting a true mistake of fact, rather than an "alleged failure to conduct the appraisal in accordance with the [a]greement." 636 S.W.3d at 145.

The Court turns now to the particulars of the present controversy. State Farm argues that both Plaintiff's appraiser and the umpire went beyond the scope of the appraisal, as described in the insurance contract's appraisal clause, by including items unrelated to the theft of electrical wiring and copper piping from April 25, 2024. Plaintiff retorts that there was no agreement on the scope of appraisal, and that the appraisal is otherwise valid and binding.

Kentucky's courts have not analyzed the *Parrish* decision since its publication in 2021. The *Parrish* court refused to set aside an appraisal award, in part by relying on authority from outside of Kentucky. 636 S.W.3d at 144 (citing *Calais*'s language approving of appraisal review decisions in the District of Columbia, Iowa, Massachusetts, and Texas). The Kentucky Court's adoption of the rule in *Calais* suggests the Commonwealth's courts approve of that decision and its reasoning, including the *Calais* court's review of other relevant state court decisions. *See Parrish*, 63S.W.3d at 144 (citing to decisions in Iowa, Alaska, and Wisconsin).

With this in mind, the Court first looks to the face of the award to evaluate whether the appraisers understood their contractual task. *See Farmers Auto*, 768 N.W.2d at 608. The parties dispute the *scope* of the appraisal, but the parties, procedurally at least, followed the "contractual task" at hand by selecting their own appraisers who conducted separate valuations and then chose an umpire after failing to reach an agreement. *See* DE 17-12 at 57. Nothing in the Policy clarifies how, or if, the parties may limit the scope of an appraisal. The Policy does, however, lay out

---

[4] The Kentucky Court of Appeals functioned as Kentucky's highest court until January 1, 1976, when the 1975 amendments to the Kentucky Constitution created the Supreme Court of Kentucky. *See generally* Ky. Const. § 110.

"Duties in the Event of Loss," requiring the insured party to "(a) notify the police if a law may have been broken," to give State Farm notice of the loss and to "include a description of the property involved," and to "give [State Farm] a description of how, when and where the loss occurred." *Id.*

Evaluating these duties shines light on the intent of the proposed appraisal scope. The police report, for instance, describes Jacqueline Meade's interaction with the London Police:

> I spoke with Jacqueline Meade. She stated she worked for Metro Public Adjustment. Mrs. Meade was contacted by them in reference to a claim from the old Plantation Apartments in London, Kentucky. She advised she was the only adjuster around this area and was put over the claim. She stated the new property owner of the Old Plantation Apartments Maksim Yablonvskiy had attempted to contact the police department numerous times **in reference to a theft** that had occurred in the abandon[ed] apartment complex. . . .
>
> **She advised the[re] was no damage to the doors of the apartments**, so the unknown suspect(s) must've opened the unlocked doors to commit the theft. Mrs. Meade stated neither her nor the property owner has any suspects nor video surveillance footage of the theft. Mrs. Meade does not even know how much **electrical wiring nor copper piping was stolen from the apartment complex**. Total value of the items that was stolen is unknown at this time.

DE 17-4 at 3] (emphasis added). The report described the stolen property as "electrical wiring and copper piping," suggesting that the initial claim was limited to this single incident. *Id.* at 1. But Meade's first estimate and proof of loss, dated June 24, 2024, greatly and inexplicably exceeded this limited loss as it claimed tens of thousands of dollars in damage to cabinetry, doors, drywall, floor covering, insulation, carpentry, and windows for a total of $448,936.50. DE 17-7 at 7. The September 18, 2024, proof of loss supplied on State Farm's "Sworn Statement in Proof of Loss" form, however, listed both the actual cash value and the replacement cost of the "theft" loss at "$116,953.17" while noting that Plaintiff was still "waiting on engineer report" which could,

presumably, affect the "actual loss" amount. DE 17-9. Throughout the duration of the claim dispute, State Farm focused only on the claim for wiring and piping. DE 17-10 (State Farm's November 7, 2024, estimate limited to copper theft); DE 17-5 (Root Affidavit); DE 19-1 (State Farm's email on November 14, 2024, further explaining its refusal to consider claims outside of the copper theft claim). Specifically, on December 22, 2025, State Farm sent Plaintiff correspondence expressly agreeing to an "appraisal concerning the theft claim for copper wire and copper plumbing," denying that it would agree to an appraisal for anything else without further research, and announcing that "State Farm will utilize Engle Martin as its appraiser for the theft claim for wiring and copper pipes." DE 17-13 at 1–2.

The record before the Court paints a confusing and incongruous picture. State Farm received a claim for copper theft from an isolated incident at a single building. Plaintiff retained Meade to prepare a Proof of Loss document and otherwise interface with State Farm. Meade's Letter of Engagement lists that Plaintiff retained her to "advise and assist in the adjustment of this insurance claim arising from a **loss due to theft** which **occurred on or about 4/25/24** at the loss address of 453 S Laurel Road, London, Kentucky 40744." DE 17-3 (emphasis added). Meade first filed a police report which focuses solely on the copper theft. Per Root's sworn and uncontradicted proof, at the physical inspection, Meade showed State Farm but one building and cabined the claim to copper theft. *See* DE 17-5. The photos are also so limited. *See* DE 17-6. Then, she presented a Proof of Loss, of her own creation, which went well beyond the single instance of wiring and piping theft. State Farm requested a new Sworn Proof of Loss, on State Farm's approved and policy-based form,[5] which Meade completed and which contained only loss claims related to the theft of copper wiring and piping. State Farm prepared its own estimate,

[5] *See* DE 17-12 Policy at section 1.c.1(g)(referencing proof of loss requirement on State Farm's "necessary forms").

which differed from Meade's Sworn Proof of Loss by just $2,318.26. *Compare* DE 17-10 *with* DE 17-9. A review of the Policy's "Duties in the Event of Loss," therefore, supports State Farm's narrative that the company agreed to an appraisal only on the theft of copper wiring and piping. That was the only type of claim or loss that had ripened into a dispute over valuation, which is the process gravamen. State Farm had not adjusted or been presented (as to the appraisal scope) a proper claim expanding the matter to include loss, damage, or theft of unrelated building materials or items from the full apartment complex. Importantly, nothing from Meade disputes how Root, under oath, describes the interactions and chronology.

The parties followed the Policy's appraisal procedures. Plaintiff invoked the appraisal provision on December 5, 2025, appointing Jason Juday of Pride Estimating as their appraiser. DE 19-3. State Farm, which had agreed to go forward only on the copper-theft subject matter, appointed Karen Taylor of Engle Martin as their appraiser on December 24, 2025. *Id.* Plaintiff, in the same email thread, later disputed that the claims outside of the copper theft were not previously disclosed. *Id.* The estimates of Juday and Taylor differed significantly, triggering the umpire provision. The umpire then produced an award of $498,676.18, covering claims at all six buildings and including replacement costs for HVAC, cabinetry, aluminum windows, and other items seemingly unrelated to the copper theft. DE 17-16. The umpire's result hardly touches on the actual field of the disputed appraisal. This shows mistake and misalignment with the policy levers.

In *Farmers Auto*, the Wisconsin Supreme Court found that the scope of the award suggested that the appraisers understood and accomplished their contractual task, supported by the fact that the three appraisers all agreed on the award amount. 768 N.W.2d at 602, 608. Here, on the other hand, the parties' chosen appraisers presented wholly different appraisal reports that

differed materially in scope. The gross difference between the two appraisers' estimates suggests that the appraisers did not understand their collective task, unlike the appraisers in *Farmers Auto* who clearly understood the scope of their assignment. The results are measurements of different disputes, like the acreage misconstruction in *Elswick*. State Farm did not submit to appraisal the same scope of loss Plaintiff attempted. That mismatch indicates a mechanism out of square with the parties' contractual undertaking and submission.

The affidavit of Karen Taylor supports this finding. Taylor declares that she understood the appraisal to concern only "a claim for a theft loss of copper in an apartment building," and that she was "unable and unwilling to estimate items for which State Farm had not investigated[.]" DE 17-17. She addresses the fact that that the umpire's appraisal award

> did not provide an itemization of materials such as copper wiring, plumbing materials or the labor associated with repairing or replacing the items stolen as part of the copper theft. Instead, the Appraisal Award included costs for labor and materials which were not to be included in the appraisal process, involved damages which had not been investigated, adjusted, or evaluated by State Farm, and exceeded the scope of the intended appraisal addressing the cost of materials and labor to address electrical wiring and piping which had been stolen from one of the apartment buildings located in London, Kentucky.

*Id.* She believes that the ultimate appraisal award encompassed costs "well outside the scope of appraisal for copper theft[.]" *Id.*

This situation more clearly resembles the "mistake of fact" in *Elswick*, where the appraisers appraised only 80 acres, but the commissioner sold 176 acres. 154 S.W.2d at 715. The mistake in *Elswick* was one of scope: How many acres of land did the appraisers need to value? The mistake here is also one of scope: Was the appraisal limited to the April 2024 theft of copper at a single building, or did it go beyond that to include conceivably every damaged or stolen construction

item at the abandoned apartment complex?[6] The record before the Court suggests that under either standard—a mistake of fact or a misunderstanding of the task—the appraisal features a fatal defect.

The correspondence between the parties suggests, at the very least, a complete misunderstanding over the nature of the appraisal and even the claim itself. State Farm treated the claim from the beginning as a single claim, from one building, for damages resulting from the April 2024 theft event. Plaintiff suggests that its claim went beyond this amount. But Plaintiff's support for this theory is lacking. Plaintiff points only to Meade's outlier estimate (which conflicted with the field inspections and the sworn formal Proof of Loss) and a single email exchange to support their theory of the appraisal's scope. State Farm, on the other hand, provided detailed records showing that they disclaimed this larger scope and focused empirically on the copper loss on multiple instances. The record well-supports this, buttressed by Meade's engagement letter stating that she represented Plaintiff's claim for the April theft event, Meade's own police report describing a single theft event, and the second Sworn Proof of Loss provided by Meade. Convincingly, State Farm provided the affidavit of its chosen appraiser, who swore that she understood the scope of the appraisal to be limited to the single theft event. Even if Plaintiff countered this affidavit with the sworn statements of its own appraiser and the umpire—which it did not—this would only prove an apparent fact: The appraisers were valuing wholly different scopes. On this basis, the appraisal award must be set aside as the appraisers and umpire failed to understand or were mistaken as to the agreed scope of their task under the policy.

[6] The parties do not discuss this fact, but it is clear from the record that the property was not in use as an apartment complex or even in habitable condition as such. The police report describes it as an "abandoned apartment complex" where contractors were working to restore the buildings. DE 17-4. This fact could explain Plaintiff's desire to include far more than just "copper theft" in its claimed losses. This would also explain State Farm's repeated refusal to consider damages unrelated to this single theft incident. *See* DE 19-1 (explaining denial of coverage for long-standing issues with windows, doors, and flooring).

A few final notes. As to the appraisal process, and even for a binding result, State Farm reserves the right to deny a claim. This undercuts the notion that State Farm could not effectively condition the scope of appraisal when it has not yet effectively had the opportunity to investigate a claim. Further, that Meade twice hosted State Farm inspections and twice limited the claim field to copper theft in one building is very telling. Meade's inexplicable June estimate prompted the reinspection by Root, where Meade *again* indicated the segregated and limited claim. Of course, her formal proof of loss, on State Farm's required form, confirmed as much. Though one supposes Plaintiff's claim remains to be determined, as a matter of this litigation, the appraisal issue simply did not properly take cognizance of more than the copper theft. The appraisal result is ill-founded, and the Court sets it aside. Affirming the result here would be a windfall for Plaintiff and would do violence to the intended mutual economies in the appraisal mechanism.

## III. Conclusion

Plaintiff takes issue with the fact that State Farm "improperly seeks to relitigate the amount of loss" with this motion. DE 19 at 23. It is true that "a court will not interfere with an appraisal award but, to the contrary, will indulge in every reasonable presumption to sustain it in the absence of fraud, mistake, or misfeasance." *Lakewood Mfg.*, 422 F.2d at 798. But State Farm has demonstrated the existence of such a mistake and has shown the award to conflict with the agreed appraisal scope. The record shows that the appraisers engaged in the contractual appraisal requirement under a mistaken belief as to the scope of their task. This warrants setting aside the May 14, 2026, appraisal award as a mistake due to the appraisers' lack of understanding of their contractually assigned task. *Parrish*, 636 S.W.3d at 145. The Court will vacate the appraisal award and order the parties to proceed to discovery.

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. State Farm's Motion to Set Aside the Appraisal Award**, DE 17,** is **GRANTED**.

2. The Umpire's May 14, 2026, Appraisal Award**, DE 17-16,** is set aside and vacated.

This the 28th day of October, 2026.

**Signed By:**
***Robert E. Wier*** REW
**United States District Judge**